## Case No. 17,363.

### WEIMER v. SLOANE.

[6 McLean, 259;[1] 4 Am. Law Reg. 174.]

District Court, D. Ohio. Oct. Term. 1854.

ESCAPE OF SLAVES—AIDING AND ABETTING—ARRESTS BY AGENTS — COUNSEL FOR FUGITIVE SLAVES.

1. To sustain the allegations of the declaration in this suit. which is for aiding or abetting in the escape of slaves. under the fugitive slave act of 1850, it must appear that the alleged fugitives were slaves who had escaped from service. and had been arrested by the owner or his agent: and that the defendant. with knowledge of these facts, aided and abetted their escape.
[Cited in U. S. v. Buck, Case No. 14,680.]
[Cited in U. S. v. Weld, 1 Kan. 597.]

2. The statute authorizes an arrest, either by the owner or his agent. with or without warrant; but, when made by an agent, he must be authorized by a written power of attorney, executed and authenticated as required by the statute.

3. To make the defendant liable. it must appear that he had notice or knowledge that the slaves were fugitives. and were, at the time of the alleged unlawful interference, in custody under an arrest: but this notice or knowledge may be inferred from circumstances.

4. The test of the legality of an arrest is the law, and not the opinion of the defendant.

5. Any words or actions tending to effect an escape, and which lead to that result. are sufficient to implicate the defendant in the charge of aiding or abetting the escape.

6. An intention to effect an escape must appear, but such intention may be inferred from the facts. Every one is presumed to have intended the result necessarily and legitimately flowing from his acts.

7. A party acting as counsel for a fugitive slave, is protected from the consequences of his acts. so far only as they are within the proper limits of his professional duty.

[This was an action by Lewis F. Weimer against Rush R. Sloane to recover the value of certain slaves.]

Coffin & Stanbery, for plaintiff.
Vinton & Hunter. for defendant.

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

LEAVITT. District Judge (charging jury). This action is founded on the seventh section of the act of congress, of the 18th of September, 1850 [9 Stat. 462], known as the "Fugitive Slave Act," and is brought to recover the value of three persons named in the declaration, who, it is alleged, were the slaves of the plaintiff, owing him labor or service as such, in the state of Kentucky, and who escaped from him into the state of Ohio. There are several counts in the declaration, but as a verdict is insisted on, upon the third count only, charging the defendant with having aided, assisted, or abetted, in the escape of the alleged fugitives, the inquiries of the jury will be limited to that charge.

To sustain this charge, it must appear to the satisfaction of the jury, that the persons named in the declaration, at the time of the alleged illegal interference by the defendant, were the slaves of the plaintiff, owing him labor or service in the state of Kentucky; that they escaped into the state of Ohio, and had been arrested either by the owner, or his agent or attorney; and that the defendant, with knowledge that they were slaves, and had been arrested as fugitives, unlawfully aided, abetted, or assisted them to escape.

As it is not controverted, that the alleged fugitives. were the slaves of the plaintiff in Kentucky, and that they. escaped into Ohio, it is not necessary to advert specially to the evidence proving these facts. I will briefly notice the testimony touching the nature and extent of the defendant's interference with the rights of the plaintiff, before I advert to the legal principles involved in the case.

The first witness introduced by the plaintiff is James P. Patton, who says, that being at Sandusky city, in pursuit of some slaves who had escaped from his service, he received at that place a power of attorney from the plaintiff, authorizing him to arrest the slaves named in the declaration; that on the 20th of October, 1852, the slaves arrived in the cars, and were seen by the witness at the depot of the Mansfield Railroad. They were conducted by a colored man, from the depot to the steamboat Arrow, then lying at the wharf of the city, and were put on board. Witness called on Rice, a police officer of the city, and one Hedges and another person to assist in the arrest of the negroes. They went on board the steamboat, and the witness Patton saw and recognized them. He enquired of them, if they did not wish to return to Kentucky. George, one of the negroes, replied, that he did not care about going back. They were then arrested, it being about half after seven in the evening of the 20th of October, and, followed by a large crowd, proceeded to the mayor's office. The negroes were taken into the office. and took their seats on a settee on the south side of the room. The Mayor, Mr. Follett. was in the office; the room was crowded, and there was a good deal of excitement. Witness stated to the people present that the negroes were slaves, and informed the mayor

that he wanted a trial, to prove property. The power of attorney under which he made the arrest, with some others in his possession, had been laid upon the table at which the mayor was writing, by Rice. After some time, the mayor said he doubted whether he had any authority to try the case, and refused to do so, at the same time referring witness to a magistrate. Witness said he was determined to hold the negroes. The defendant stepped out of the crowd, and said, who is it that detains these colored people? Witness replied that he did. Defendant then enquired if Marshal Rice was in the room, and Rice replied that he was. Defendant asked Rice if he had a warrant to arrest the negroes, who said he had no warrant. Defendant then asked witness if he had a warrant, and was informed that he had none, and that he had arrested the negroes without any warrant, and brought them before proper authority, etc. Defendant said to witness, you should have had a warrant, and could not arrest without a warrant. Witness replied that he could arrest without a warrant, and intended to hold the negroes, and would hold every one responsible, if they were taken from him. Defendant smiled at this. Some conversation then followed about the value of the slaves, and witness said to defendant, he would hold him individually responsible, if he interfered with them, and that he might expect to pay $1,000 for each of the negroes, if he caused them to be taken out of his custody. Some conversation then took place, as to the ability of the defendant to pay for the slaves. Witness said he would have to pay for them if he interfered in their rescue, as he would certainly be sued. Defendant then took off his hat, and waved it over his head and said, Colored friends, arise, and take those colored friends of yours out of the room, with a row, or a rush. Witness is not quite certain which of these words were used. The crowd, of whom some twenty were colored men, some of them armed with clubs, rushed towards the slaves, and forced them out of the room, with a rush. Witness has never seen them since, and they have never been retaken. On his cross-examination, the witness stated that the power of attorney from the plaintiff was delivered to him at Sandusky, about a week before the arrest, and that before going to the mayor's office, he had handed that, with others, to Rice. At the office, the mayor requested witness to select the power identifying the negroes; he selected it, with another, and handed them to the mayor. Witness was armed with a revolver. Says he did not know till next morning, that defendant was a lawyer.

W. W. Hedges says, he was at Sandusky city in pursuit of some negroes who had escaped from him in Kentucky. First saw the plaintiff's negroes on the steamboat Arrow, on the night they were arrested. Was informed they were there, and assisted Patton, Rice, and another person, to take them. Patton had requested him to assist. The negroes were arrested at the cook-room of the boat. Witness went with the crowd to the mayor's office, after the arrest. Rice was in company, and on going into the office, he laid some papers on the mayor's desk. Some conversation took place between Patton, Rice, and the mayor, which witness did not hear. Heard some one ask, who brought the negroes there. Did not know defendant then. Now thinks it was the defendant who made the enquiry. Defendant then enquired for Rice, and asked him if he had a warrant to arrest the blacks. Then asked Patton if he had a warrant. Patton said he had none, but was authorized to arrest them. Defendant then took off his hat and waved it, saying: Colored people, remove your friends with a rush or row. On his cross-examination, the witness says he thinks defendant had a white hat. Says that two of the negroes, a man and a woman, recognized Patton on the boat, before the arrest. Says, also, that he heard defendant distinctly at the mayor's office, and that he spoke loud.

Oliver Rice testifies, that in October, 1852, he was acting as a constable and marshal of Sandusky city. Was at the steamboat Arrow. Patton and one Shrove had some negroes in charge. Patton said he had arrested them as slaves, and handed his papers to witness. Went to mayor's office; there was quite a crowd, and a good deal of excitement. Witness laid the papers on the mayor's desk. Did not hear much of the conversation between Patton and the mayor. After some time, defendant came into the room. Some conversation between defendant, Patton, and the mayor. Defendant had taken his seat near the mayor. Heard him ask if Rice, the marshal, was present. Witness replied that he was. And defendant then enquired of him if he had a warrant to arrest the negroes. Witness replied that he had no warrant. Defendant then raised his hat, and said: Friends of these colored people, remove them with a rush; and they all went out. There were a good many colored persons present, armed with clubs. Witness heard one of them say, they should never take the negroes away alive. On cross-examination, says, he thinks Patton was at the railroad depot. Patton had informed witness before what his business was, and that he wished witness to assist him. Witness's object in going to the steamboat was to suppress any riot, etc. Says defendant spoke in a loud voice at the mayor's office, and that he wore a white hat.

On the part of the defendant, a good deal of testimony has been introduced to prove the occurrences at the mayor's office, and to discredit the statements of the plaintiff's witnesses.

John B. Lott says, he was on the steamboat at the time the negroes were arrested, and went with the crowd to the mayor's office; called on the defendant at his office, to procure his services for the negroes as counsel. Defendant proceeded to the may-

or's office, enquired for Rice, asked him if the negroes were in his custody, and wished to see the authority by which they were held. Said he saw nothing to authorize their detention. Witness heard some one then say, hussle them out, and they all left the room.

Marshal Burton says, defendant is an attorney at Sandusky city. Witness was at the mayor's office, evening of October 20, 1852. It was much crowded. Heard defendant enquire by what authority the negroes were detained. Defendant was near the center of the room. Witness heard no answer to defendant's inquiry. Thinks defendant asked a second time for the authority by which the negroes were held. No reply to this. Defendant said, he saw no reason why they should be detained. Some one said, hussle them out. Witness saw defendant in the room. Thinks he had no hat on. Saw no movement of his hat. Heard nothing said by defendant about moving the colored people with a rush. Thinks he would have heard it, if it had been said. Did not hear defendant enquire for Rice. Thinks he would have heard it, if such enquiry had been made.

H. M. Cheeseborough: Was present at the mayor's office. Was there ten or fifteen minutes before anything was done in the way of business. Did not notice defendant, till he heard him enquire by what authority the negroes were held. Did not seem to address this enquiry to any one in particular. Witness heard some one ask for Rice. Some person said, the papers were with the mayor. Defendant repeated his enquiry as to authority. He paused, turned partly round, and said, there appeared to be nothing against these persons to detain them. Some one said, hussle them out, and the room was soon clear. When defendant spoke of there being no authority to detain the negroes, he turned toward the place where they were sitting. Did not see his hat, or any motion with a hat. Did not see Rice in the room at all. Heard nothing from defendant about colored persons removing their colored friends with a rush. Thinks he would have heard it, etc.

Mr. Jennings says, he was at the mayor's office. Saw defendant come in. Was accompanied by a colored man. Thinks he had a book in his hand. Heard defendant enquire, by what authority the negroes were detained. Thinks he heard the mayor say, he had no jurisdiction of the matter. Heard defendant ask for Rice. Rice came forward, as witness thinks. Defendant enquired if the negroes were in his custody. Rice said they were not detained by a warrant in his hands. Defendant then said, if there is no authority for holding them, they can go. All went out in a hurry. Thinks defendant had no hat on. Not positive as to this. Did not hear him say colored friends, etc. Thinks he would have heard the words, if

they had been used. When defendant said, if there is no authority to hold the negroes, they can go, he turned round to the crowd.

Mr. Clark: Was at the mayor's office. Heard defendant enquire twice, by what authority the negroes were detained. Heard no reply. Defendant then said, he saw no reason why they should be detained. A colored man by the name of Locke, then said, rush them out, and they all left. Defendant had no hat on, and did not appear to be excited.

Joseph Jibbeau testifies as to what happened at the mayor's office: Defendant enquired for authority, etc. Asked for Rice, who came forward, and defendant asked him if he had a warrant. Rice said he had no warrant, etc. Defendant then asked, if there were any papers or authority by which the negroes were detained. Asked two or three times. No reply to this. After a short pause, defendant said, Colored friends, I don't see any thing to detain your friends. Locke then said, hussle them out, and they went out in quick time. Defendant spoke in a medium tone of voice. Thinks he had no hat on. Did not wave his hat. Did not use the words attributed to him by plaintiff's witnesses. Thinks he heard some one say, in reply to defendant's enquiry for authority, that the mayor had the papers.

Mr. Follett: Was mayor of Sandusky city, October 20, 1852. Heard a noise in the street. The crowd came into the office. Witness was writing at the time. Knew there were slaves there. Negroes were seated in the room. Witness paid no attention, but kept on writing, with his back to the negroes. After some time, Rice came in and laid the papers on witness's desk. Did not look at the papers. Mr. Bill asked, what he was going to do. Witness replied, he had no jurisdiction. Thinks he never spoke to Patton, or Patton to him. After some time, Rice came to his desk, and witness handed the papers to him. Rice asked witness if he had examined them, and witness replied that he had not. Witness went towards the door. Defendant came in, turned round and said, By what authority are these persons held in custody? Are there any papers to show why they are held here? Thinks Patton said, Rice has the papers. Defendant then said, Colored citizens, I see no authority for detaining your colored friends. The negroes and the crowd then went out. Patton then came up to defendant, and said, Here's the papers; those slaves are mine, and I will hold you responsible. Witness supposed that claimant had not before made known his claim. There was not much noise or excitement. Recollects distinctly that defendant had no hat on, or with him. Thinks it was after the crowd had left, and before Patton said, Rice has the papers, that defendant made the remark, that he saw no authority for detaining the negroes, etc. Defendant may

have used these words before. Witness says defendant did not use the words testified to by Patton, Hedges, and Rice. That Patton did not come to his desk, and ask him what he was going to do, and select the papers, etc.

Having given this condensed statement of the material facts in evidence, I do not propose to analyze, or make any comments upon them, with a view of aiding you in coming to a conclusion, as to what is or is not proved. That duty belongs exclusively to the jury, and I leave it to their deliberate and unbiassed action. I shall merely state the legal principles involved in the case, and leave it to the jury to make the application of them to the facts.

As before stated, there is no dispute in this case, that the three persons named in the declaration as the slaves of the plaintiff, were in fact such in Kentucky, and that they escaped thence into the state of Ohio. But it must moreover appear, that they were in legal custody, by an arrest, either with ·or without warrant, by the owner or some person legally authorized by him to recapture them. The 6th section of the act of congress before referred to, provides, "that where a person held to service or labor in any state or territory in the United States, has heretofore, or shall hereafter escape into another state or territory of the United States, the person or persons to whom such service or labor may be due, or his, her, or their agent or attorney, duly authorized by power of attorney in writing, acknowledged and certified under the seal of some legal officer or court, of the state or territory in which the same may be executed, may pursue and reclaim such fugitive person, either by procuring a warrant from some one of the courts, judges or commissioners aforesaid, of the proper circuit, district or county, for the apprehension of such fugitive; or by seizing and arresting such fugitive, where the same can be done without process; and by taking or causing such person to be taken before such court, judge, or commissioner," etc.

It will be seen from the foregoing provision of the statute, that the authority is expressly given to the owner of the fugitive, or his agent or attorney, to arrest without warrant. The arrest in this case was made by Patton, as the agent of the plaintiff, without any warrant for this purpose. It appears also, that the power of attorney under which he acted as agent, was executed and authenticated according to the requirement of the act of congress. The arrest of these fugitives was therefore clearly authorized by law, and they were legally in the custody of the plaintiff's agent, at the time of the alleged interference by the defendant.

But to sustain the present action, it must appear to the satisfaction of the jury, that the defendant had notice or knowledge that these persons were fugitives, and were legally in custody, when he aided in their escape. It is one of the material allegations in the plaintiff's declaration, that defendant knowingly, willingly, and illegally aided or abetted the escape of the fugitives. This must therefore be proved, as essential to the plaintiff's right of recovery. But the knowledge of the defendant, both as to the persons' being fugitives and being in legal custody, either may be established, by positive proof, or may be inferred from circumstances. In the case of Giltner v. Gorham [Case No. 5,453], it was held, that "to bring an individual within the statute, he must have knowledge that the colored persons are fugitives from labor, or he must act under such circumstances as show that he might have had such knowledge, by exercising ordinary prudence." It is in evidence in this case, that the defendant was employed as counsel for the fugitives, and it is not perhaps an unreasonable presumption, that he was apprised of all the facts which rendered it necessary ·that his professional aid should be invoked in their behalf.

As already intimated the jury must be satisfied that the defendant had knowledge that the fugitives had been arrested, and were in custody at the time of his alleged interference. If the plaintiff's agent held them without authority, they were illegally detained, and no one could have incurred liability by aiding them in their escape. It will be for the jury to determine, in reference to all the circumstances, whether the defendant may not be presumed to have known that the fugitives had been arrested. It is in evidence, both by the plaintiff's and defendant's witnesses, that on entering the mayor's office, he enquired by what authority the colored persons were held. If the witnesses for the plaintiff are entitled to credit, he was informed distinctly that the negroes were claimed by Patton as agent of plaintiff, and that he had arrested them, as he was authorized to do, without warrant. From the occurrences which followed the announcement of the fact, that the arrest had been made without warrant, it seems most probable the defendant supposed the negroes could only be taken and held in custody, by an arrest under a warrant. The power of attorney, proving the agency of Patton, was laid on the mayor's desk, and could have been seen by the defendant, if he had wished or requested to see it. If, under the erroneous belief that a warrant was necessary to justify the arrest of the fugitives, he did not ask for its production, or use reasonable diligence to ascertain the existence of the instrument, he is not protected from the consequences of his acts. As before stated, no liability was incurred by the defendant, without a legal arrest and detention of the fugitives; but the test of the legality of the arrest is to be determined by the statute, and not by the opinion of the defendant. On receiving information that there was no warrant, it would have been altogether proper for the defendant to have required the production of the written power under which the plaintiff's agent acted; and if this request had been evaded or refused, there would have

been reason for the conclusion, that the fugitives were in custody without any authority to detain them.

If the jury are satisfied that these persons were fugitive slaves and were legally in the custody of the plaintiff's agent, at the time of their escape, and that these facts were known to the defendant, or that, from the circumstances, he is fairly chargeable with such knowledge, the further enquiry remains, whether he aided, abetted, or assisted in their escape, in the sense of being liable to the penalty fixed by the statute. On this subject, I have only to remark, that any words or actions tending to produce an escape, if the result follows, will subject a party to the penalty of the law. It is not necessary that there should be any physical force used, to effect the escape. It is true, the party implicated must have intended such a result, but this intention may be inferred from the facts. Every one is presumed to have intended whatever is the necessary and legitimate result of his acts. If therefore an escape follows, as the result of certain words or acts, the law raises the presumption, that it was intended, and holds the party responsible.

In the case of Vaughan v. Williams [Case No. 16,903], which was an action for damages for rescuing certain slaves from the possession of the plaintiff, the learned judge said, in reference to what constituted an interference, subjecting the defendant to the penalty of the statute, that "if he (the defendant) countenanced and encouraged, from time to time, the movements of the crowd which resulted in the rescue, or being present, sanctioned it in any form, he is liable to the penalty. A man cannot incite others to the commission of an illegal act, and escape the consequences by the plea, that he did not put forth his hand in the consummation of the act."

As to the occurrence at the mayor's office, there are some discrepancies between the witnesses for the plaintiff and those for the defendant. It is the exclusive province of the jury to decide upon the credit due to the testimony of witnesses. It will be their duty, if practicable, to harmonize their conflicting statements, and thus avoid the conclusion that any have wilfully falsified the truth. But if this cannot be done, they must receive or reject the testimony, as their best judgment shall dictate. If the witnesses for the plaintiff are accredited, there is no room for a doubt, that the defendant unlawfully interfered for the rescue of the slaves. The words attributed to him by these witnesses, could have no other effect, under the circumstances of the case, than to induce the crowd to interfere for the rescue of the slaves. Rice, one of the plaintiff's witnesses, is impeached by proof of bad character for truth; and unless his testimony is corroborated by other witnesses entitled to credit it will be the duty of the jury to reject it.

The points of difference in the narratives of the witnesses, as to what took place at the mayor's office, are doubtless obvious to the jury, and need not be specially noticed. If, however, the jury shall reject the statements of all the plaintiff's witnesses, as unworthy of credit, it will be proper for them to enquire whether, upon the defendant's evidence, a verdict ought to pass for the plaintiff. What is sufficient to constitute an illegal aiding, abetting or assisting, the escape of a fugitive slave under the statute, has been stated by the court. It will be for the jury to make the application of the principles laid down, to the facts before them. It will be for them to enquire and decide, whether the evidence warrants the conclusion that the acts and words of the defendant were the direct cause of the escape of the negroes. If, without implicating the defendant, they can find a satisfactory reason for the sudden and hurried movements in the mayor's office, resulting in the escape of the slaves, it will be their duty to do so. The statute under which this suit is instituted, is highly penal in its provisions, and the party seeking a recovery upon an alleged violation of it, should be held to strict proof.

There is one point which has been strenuously urged by counsel, to which it is the duty of the court to call the attention of the jury. It is insisted, that the defendant acting as counsel for the fugitives, did no more than he was warranted in doing from his professional relation to them. In the case of Norris v. Newton [Case No. 10,307], one of the defendants acting as counsel for the slaves it was contended that in that character he was protected from liability. The court stated the law to the jury in these words: "So far as his acts were limited to the duties of counsel he is not responsible. But, if he exceeded the proper limits of a counsellor at law, he is responsible for his acts, the same as any other individual." This is doubtless the true principle, as applicable to this point. Persons arrested and in custody upon the charge of being fugitive slaves, have an undoubted right to all the benefits of counsel. And it is in no sense improper, that counsel should advise and assist persons in that situation. In their professional character, they may enquire into the authority by which the fugitives are held, or insist on a legal investigation of the question whether they are slaves; and on the hearing before competent authority, may urge their discharge from custody. If satisfied they are illegally restrained of their liberty, the great remedy by writ of habeas corpus may be rightfully resorted to. In short, any proceeding which is in accordance with the law of the land, may be instituted to test the question of the legality of their detention. But it would be extending the principle of professional privilege too far, to say that a lawyer is justified, even in behalf of a fugitive slave, in aiding and assisting his escape, in any mode which the

law does not sanction. There is perhaps good reason to infer, from the evidence in this case, that the defendant supposed the slaves could not be held in legal custody, without an arrest by warrant. As already stated, the law does not require this process to authorize an arrest. And if the defendant under a misapprehension of the statute has brought himself within its penalties, he is not protected from responsibility by his professional character.

But it is quite unnecessary to detain the jury with further remarks, in committing this case to them. The trial has been conducted throughout, by the counsel, not only with great ability, but with great fairness. No efforts have been made to introduce any false issues, or in any way to divert the minds of the jury from the merits of the case. This is creditable to the gentlemen concerned, and worthy of their distinguished professional standing. It remains for the jury, excluding every extrinsic consideration from their view, to decide this case in accordance with the duty their oath imposes. If, in their judgment, the plaintiff has sustained an injury for which the law, applied to the facts, entitles him to redress, I have the fullest confidence they will award it to him by their verdict. If, on the other hand, they should come to the conclusion that the defendant is not implicated as charged, the jury will cheerfully acquit him of all censure, by a verdict in his favor. And I need not say that in the decision of this case, the individual views of the jurors, as to the justice and expediency of the law upon which the action is founded, should have no weight.

The jury returned a verdict for the plaintiff, which, on a motion for a new trial, the court refused to set aside.